# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KEITH BRYAN WEBB-EL,** | : | **CIVIL NO. 1:17-CV-321** |
| | : | |
| Petitioner | : | **(Chief Judge Conner)** |
| | : | |
| v. | : | |
| | : | |
| **L.J. ODDO, WARDEN,** | : | |
| | : | |
| Respondent | : | |

## **MEMORANDUM**

Presently before the court is a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 (Doc. 1), filed by petitioner Keith Bryan Webb-El ("Webb"), a federal inmate confined at the United States Penitentiary at Allenwood, in White Deer, Pennsylvania. Webb challenges his 1985 conviction and sentence imposed by the United States District Court for the Western District of Texas. (Id.)

**I.    Background**

The factual background of this case has been aptly summarized by the Fifth Circuit Court of Appeals as follows:

> Fort Bliss is a military reservation located in El Paso, Texas. June Webb was a soldier in the United States Army stationed at Fort Bliss at the time of the events in issue in this appeal. June Webb resided in military housing on the base, along with her putative husband Keith Webb, the defendant in this case. Between one and two o'clock in the morning of September 6, 1983, June Webb and Keith Webb appeared at the Criminal Investigation Division (CID) office at Fort Bliss ostensibly to report that June Webb had been raped. Once June Webb was physically separated from Keith Webb in the CID office, June Webb asserted that Keith Webb had killed her son, Steve Marcel Wilson, some weeks earlier.

After obtaining further details from June Webb, the CID agents approached Keith Webb stating that they desired to question him about an alleged homicide. Keith Webb fled the CID office area into the dark, and the agents were unable to locate him. Approximately six hours later, the CID was notified that an unknown individual was on top of a communications tower near the CID office and was threatening to commit suicide. When the CID agents arrived at the tower they were able to identify the individual as Keith Webb. Almost immediately upon being spotted by the CID agents, Webb shouted that if they would get his wife and a priest, he would tell them where the body was buried.

While on the tower, Webb threatened to commit suicide. Unable to persuade Webb to come down from the tower, the CID agents summoned an army psychiatrist and CID crisis negotiator. By means of a mechanical device known as a "cherry picker", the psychiatrist and negotiator were elevated to a position near the tower where they could communicate with Webb. Initially, Webb was much higher on the tower than the negotiators, but he eventually came down to their level. In order to take Webb's mind off his threatened suicide, and to talk Webb down from the tower, the negotiators engaged Webb in a continuing dialogue. While on the tower, Webb repeatedly confessed to the psychiatrist and negotiator, stating that he had bashed his son's head against a wall, that he had scalded his son, that his son had died, and that he had buried him in the desert. Neither the psychiatrist nor the negotiator gave Webb Miranda warnings.

At approximately 10:00 a.m. Webb climbed down from the tower, was handcuffed and advised of his rights. Webb indicated that he wanted a lawyer before he would answer any questions. Webb was then taken to the CID office and allowed to see June Webb, as Webb had requested. Upon seeing her, Webb stated, "Well, if I'm going down, you're going down with me, so you might as well tell them you're a part of it." Webb was then allowed to sleep on a couch.

At 11:00 a.m. FBI agents arrived at the CID office. Webb was again given Miranda warnings, and Webb for the second time requested counsel before answering questions. The FBI agents then left to conduct their initial investigation of the alleged homicide. At 1:55 p.m. the FBI agents returned to the CID office and formally arrested Webb. The FBI agents again advised Webb of his rights, and for the third time Webb requested an attorney. Webb was then taken to the FBI office, where he was fingerprinted, photographed, and advised of his rights. For the fourth time, Webb asked for an attorney. At each

2

request for an attorney, the agents properly ceased questioning Webb. The FBI agents then booked Webb into the El Paso County Jail at approximately 3:00 p.m. on September 6, 1983. The booking card stated that Webb was charged with murder on a federal reservation.

The FBI agents returned to their office to prepare a complaint so that Webb could be presented to a magistrate that day. A complaint was presented to a magistrate at 5:15 p.m. that evening, but the magistrate found the complaint unacceptable. The magistrate directed the agents to redraft the complaint and present Webb at 11:00 a.m. the following day. Webb eventually was presented at the designated time on September 7, 1983.

Meanwhile, at the El Paso County Jail, Officer Simmons, the classification officer on duty, allowed Webb to make a telephone call and then gave Webb something to eat and drink. According to Simmons, in order to determine where in the jail population to place Webb, Simmons asked Webb, "[W]hat kind of shit did you get yourself into?" According to Simmons, Webb's surprising reply was: "I murdered my son and buried him in the desert." Simmons then asked Webb, "Don't you think it be better if he got a Christian burial?" And then Simmons further asked, "Would you like to talk to the people that brought [you] here?" Webb indicated that he did want to talk to the FBI agents. Simmons relayed this information to his superior officer. The FBI was contacted at about 4:15 p.m. and given the message that Webb wished to talk with them.

Two hours later the FBI agents arrived at the jail. The agents again advised Webb of his rights and asked him if he wanted to talk to them. Webb signed a form waiving his rights. After trying to explain where he had buried his son, Webb agreed to lead the agents to the grave. Webb was not questioned on the trip to the grave. Webb indicated where the agents should drive and stop the car; he then walked them to within a few feet of the grave. Webb identified the grave by stating, "There's Stevey."

On the way back to jail, Webb asked the agents what would happen next. The agents began explaining the procedures that would begin with Webb's appearance before the magistrate the next day. Webb, however, wanted to talk about the events leading up to the death of his son. Webb gave the agents a detailed explanation of how his son died, stating that he (Webb) had bashed the child's head against the wall until a soft spot in the skull developed. The child suffered seizures thereafter. Webb also admitted placing the boy in a tub of scalding water to punish the child. After that, the boy's legs began to peel, he

3

> became lethargic, and eventually he died. Webb then related how he had wrapped the boy's body in a brown blanket and buried the body in the desert.

United States v. Webb, 755 F.2d 382, 385-86 (5th Cir. 1985) (Webb I) (internal record citations and footnotes omitted).

In January 1984, Webb was found guilty of one count of second degree murder and two counts of injury to a child. Webb appealed. On appeal, the Fifth Circuit found that statements Webb made while he was on the tower threatening suicide were properly admitted at trial, but others made while he was in custody were not properly admitted. The appellate court reversed petitioner's convictions and remanded the case to the district court for a new trial. Webb, 755 F.2d at 392.

After a second jury trial, Webb was again convicted of one count of second degree murder and two counts of injury to a child. See United States v. Webb, 796 F.2d 60, 61 (5th Cir. 1986) (Webb II). On September 19, 1985, Webb was sentenced to serve life imprisonment and two terms of thirty years imprisonment to be served concurrently with his life sentence. Webb appealed. On appeal, Webb claimed that the convictions should be overturned because the victim's body was erroneously admitted into evidence under the inevitable discovery exception, the convictions violated double jeopardy, he was denied effective assistance of counsel, there was a "fatal variance" between the indictment and the proof adduced at trial, prosecutorial misconduct rendered the trial unfair, and he was denied due process. Id. at 62. The Fifth Circuit ultimately affirmed Webb's convictions. Id. at 62-65.

Webb subsequently filed at least six motions to vacate pursuant to 28 U.S.C. § 2255. The sentencing court denied each motion. On appeal, the Fifth Circuit

affirmed the sentencing court's denial of these motions. United States v. Webb, Crim. No. 83-cr-172 (W.D. Tex.) at Docs. 154, 161, 176, 184, 196, 197-200, 202, 205, 206, 208, 212, 223, 226.

Webb has also filed numerous 28 U.S.C. § 2241 habeas petitions, two of which are relevant to this action. On May 26, 2015, Webb filed a § 2241 petition in the District of Maryland challenging his "1985 convictions for murder and three counts of injury to a child," claiming that the indictment was defective and denied Webb "his right to adequate notice of the charges against him and nullifying his conviction." Webb-El v. Stewart, 2015 WL 11090390, *1 (D. Md. June 3, 2015). The court dismissed the petition without prejudice for lack of jurisdiction. Id. Webb appealed. On October 20, 2015, the Fourth Circuit affirmed the decision. Webb-El v. Stewart, 620 F. App'x 177 (4th Cir. 2015).

On March 21, 2016, petition filed a § 2241 in the Northern District of West Virginia, claiming, *inter alia*, that "he is actually innocent of the crime of second degree murder because he was not indicted for that offense." Webb v. Figiel, 2017 WL 1147470, *6 (N.D. W.Va. Mar. 27, 2017). The court dismissed the actual innocence claim, concluding it to be "barred as successive and as an abuse of the writ." Id. at *3. Webb appealed. On September 26, 2017, the Fourth Circuit affirmed the district court's denial of the § 2241 petition. Webb v. Figiel, 697 F. App'x 250 (4th Cir. Sept. 26, 2017).

On February 17, 2017, Webb filed the instant petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 claiming that the Western District of Texas did not have jurisdiction over him because there was never a true bill by the Grand

5

Jury alleging that he committed second degree murder in violation of 18 U.S.C. § 1111. (Doc. 1, at 8-10; Doc. 8). For relief, Webb requests immediate release from custody, or an evidentiary hearing to "prove his allegations." (Doc. 1, at 11).

## II. Discussion

Challenges to the legality of federal convictions or sentences that are allegedly in violation of the Constitution may generally be brought only in the district of sentencing pursuant to 28 U.S.C. § 2255. Okereke v. United States, 307 F.3d 117 (3d Cir. 2002) (citing Davis v. United States, 417 U.S. 333, 342 (1974)); see In re Dorsainvil, 119 F.3d 245 (3d Cir. 1997). Once relief is sought via section 2255, an individual is prohibited from filing a second or subsequent 2255 petition unless the request for relief is based on "newly discovered evidence" or a "new rule of constitutional law." 28 U.S.C. § 2255.

Further, such claims may not be raised in a § 2241 petition except in unusual situations where the remedy by motion under § 2255 would be inadequate or ineffective. See 28 U.S.C. § 2255; see Dorsainvil, 119 F.3d at 251-52. The burden is on the habeas petitioner to allege or demonstrate inadequacy or ineffectiveness. See Application of Galante, 437 F.2d 1164, 1165 (3d Cir. 1971). Importantly, § 2255 is not "inadequate or ineffective" merely because the sentencing court has previously denied relief. See Dorsainvil, 119 F.3d at 251. Nor do legislative limitations, such as statutes of limitation or gatekeeping provisions, placed on § 2255 proceedings render the remedy inadequate or ineffective so as to authorize pursuit of a habeas corpus petition in this court. Cradle v. United States, 290 F.3d 536, 539 (3d Cir. 2002); United States v. Brooks, 230 F.3d 643, 647 (3d Cir. 2000); Dorsainvil, 119 F.3d

6

at 251. If a petitioner improperly challenges a federal conviction or sentence under § 2241, the petition must be dismissed for lack of jurisdiction. Application of Galante, 437 F.2d at 1165.

In seeking to overcome these Section 2241 barriers, Webb essentially contends that he has previously filed Section 2255 motions with the Western District of Texas and the remedy has been inadequate or ineffective to test the legality of his detention due to the fact that the sentencing court denied relief. (Doc. 1, at 5-6). Webb further claims that that sentencing court "has no 2255 Motion subject matter jurisdiction over his present physical immediate confinement." (Id. at 6).

Webb's argument as to why the remedy available pursuant to Section 2255 is "inadequate or ineffective" to address his challenges to his federal sentence is unavailing. As stated, in Dorsainvil, the Third Circuit held that Section 2241 relief is available where a subsequent statutory interpretation renders a petitioner's conduct of conviction no longer criminal. Dorsainvil, 119 F.3d at 251-52; see also Okereke, 307 F.3d at 120 (holding that relief under Section 2241 is only available in "rare situations" where the crime of conviction is later deemed noncriminal). Section 2241 is not available for intervening changes in the law of sentencing. Id. In other words, if a subsequent change in the law alters only an element of sentencing but not the underlying crime of conviction, Section 2241 offers no remedy. See Okereke, 307 F.3d at 120. Here, Webb does not allege that the crime for which he was convicted has been rendered noncriminal. Rather, Webb's claim is, essentially, that he is "actually innocent" of his conviction based on his assertion

that settled law at the time of his conviction made it clear that the criminal process was defective. However, pursuant to Dorsainvil, the type of "actual innocence" claim that permits an inmate to attempt to seek § 2241 relief is limited to a claim that the conduct for which the inmate was convicted is no longer criminal. Accordingly, the limited Dorsainvil exception is inapplicable, and Section 2241 relief is not available. See Okereke, 307 F.3d at 120 (distinguishing Dorsainvil and dismissing habeas petition for lack of jurisdiction when subsequent statutory interpretation altered an element of sentencing but not the petitioner's conviction).

Furthermore, Webb has filed at least six § 2255 petitions. All were denied. The fact that Webb did not prevail in his prior § 2255 motions does not establish the inadequacy or ineffectiveness of the remedy itself. See Fisher v. Miner, 216 F. App'x 255, 257 (3d Cir. 2007) (non-precedential) ("The fact that Fisher has previously filed a § 2255 motion that was denied on the merits, and thus faces the strict gatekeeping requirements that apply to second or successive § 2255 motions, does not serve to make § 2255 inadequate or ineffective."). The remedy afforded under § 2241 is not an additional, alternative, or supplemental remedy to that prescribed under § 2255. Accordingly, because there is no basis for a determination

that § 2255 is inadequate or ineffective, Webb's § 2241 petition will be dismissed for lack of jurisdiction.

An appropriate order follows.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated: April 26, 2018